UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

THERESA IACOVO,

                                                                                                         Case No.: 2:24-cv-4372

                      **Plaintiff,**

     -against-

**MAGGUILLI LAW FIRM, PLLC, and
LAWRENCE P. MAGGUILLI,**

                      **Defendants.**

-----------------------------------------------------------------------X

## FIRST AMENDED COMPLAINT

Plaintiff Theresa Iacovo brings suit against Defendant Magguilli Law Firm, PLLC ("the PLLC"), a debt collection law firm, and its principal Lawrence P. Magguilli (collectively "Defendants") for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, and in support would show as follows.

### Summary of Claims[1]

Millions of Americans receive assistance and medical care in their own homes from home health aides. This is a preferable option for elderly people who wish to retain some independence and privacy. Like nursing homes, home health aide agencies will often be limited in how they can collect alleged debts from the recipients of their services, since many elderly people in the state of New York are "judgment-proof": their assets and income are comprised of funds like Social Security that are exempt from garnishment and restraint. Accordingly, many home health aide agencies will seek a guarantor who is not "judgment-proof," so if and when collecting becomes necessary there is a party from whom they can collect.

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

1

This case concerns when a home health aide agency's debt collectors cannot take "no" for an answer and unabashedly seek to collect a debt from a third party that has not agreed to be a guarantor. Attentive Care includes a "Guarantee of Payment" clause in its standard Service Agreement, whereby a "Co-signer/Guarantor" expressly takes on liability for any debt incurred. Plaintiff Theresa Iacovo, as Power of Attorney for her mother Geraldine Iacovo, who is blind but mentally competent, helped her mother sign up for Attentive Care's services, but refused to fill out and sign the "Guarantee of Payment" section of the Service Agreement. Despite Theresa leaving this section blank and thus leaving Attentive Care with no third party guarantor, Attentive Care began to provide services to Geraldine Iacovo, accepting by performance that non third party was guaranteeing payment to them.

However, Attentive Care sent the debt to a debt collection firm to file a lawsuit against Theresa Iacovo anyways. Defendants, on behalf of Attentive Care, filed a collection lawsuit against Theresa Iacovo and Geraldine Iacovo on June 27, 2023. Defendants then (allegedly) served the collection lawsuit solely on Geraldine Iacovo on July 10, 2023.

Theresa learned about the collection lawsuit when her mother called her, telling her that someone had served legal papers on the home health aide who had been with Geraldine (the Iacovos retained a new home health aide agency in December of 2022). On July 28, 2023, Theresa Iacovo filed a *pro se* Answer on behalf of herself and as POA for Geraldine Iacovo, stating in pertinent part "Theresa Iacovo should not be a defendant in filing as she only serves as POA for Geraldine Iacovo who is blind – Theresa did not receive any services from Attentive Care nor is a guarantor of payment." Despite being placed on additional notice that Theresa Iacovo was not liable for the debt, the Defendants moved to strike the *pro se* answer rather than discontinuing the action against Theresa Iacovo with prejudice.

2

Scared by the Defendants' aggressive litigation tactics, Theresa Iacovo searched for legal help, and eventually found it through Nassau Suffolk Legal Services. Through her newly retained legal services attorneys, Theresa filed an Amended Answer, stating in pertinent part that she was never served and never agreed to be a guarantor for the debt. Then on February 18, 2024, Theresa Iacovo served a Motion to Dismiss on Defendants. While the Motion was pending, Theresa Iacovo through counsel tried repeatedly to have Defendants stipulate to dismiss the Collection Lawsuit as to her with prejudice since there was no claim against her. While Defendants would admit on May 14, 2024 that Theresa Iacovo was not served, and stated that on such basis they would be willing to discontinue without prejudice, Defendants maintained that Theresa was liable for the debt and refused to enter into any stipulation to discontinue the case with prejudice. This position was shocking since in the very same email Defendants admitted that the section for third party guarantee of payment in the Service Agreement signed by Geraldine Iacovo had not been signed by Theresa Iacovo or anyone else.

The Defendants' conduct has compounded the emotional distress suffered by Theresa Iacovo, who is already going through the incredibly difficult ordeal of caring for her disabled and elderly mother. The unlawful collection lawsuit against her has made her cry, and she has had to take off work to go to court and look for legal assistance. The stress has caused her to lose sleep and have problems with digestion. Theresa is worried that a lawsuit against her could impact her work as a nanny. She has grinded her teeth at night due to the stress and now requires dental work. Her hair has been falling out and she is embarrassed by how she looks.

### A.  JURISDICTION AND VENUE

1. The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction

3

of the Court arises under 28 U.S.C. § 1331 in that this dispute involves predominant issues of federal law under the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2. Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Suffolk County, New York.

## B. PARTIES

3. Plaintiff Theresa Iacovo is an individual residing in Suffolk County, New York.

4. Defendant Magguilli Law Firm, PLLC ("the PLLC") is a law firm and professional limited liability corporation organized under the laws of the State of New York. Said Defendant engages in business in New York. This suit arose out of said Defendant's business in New York.

5. The PLLC regularly collects consumer debts owed or due to others by filing hundreds of collection lawsuits. The PLLC is therefore a debt collector as defined in 15 U.S.C. § 1692a(6).

6. Defendant Lawrence P. Magguilli is an attorney and the principle of the PLLC who practices in New York courts and, upon information and belief, resides in New York.

7. Magguilli has filed hundreds of consumer collection lawsuits in New York civil and supreme courts, including the Collection Lawsuit against Theresa Iacovo, as well as litigating those lawsuits by filing motions and seeking judgments and settlements.

8. Magguilli regularly collects consumer debts owed or due to others and is therefore a debt collector as defined in 15 U.S.C. § 1692a(6).

9. Magguilli and the PLLC shall be collectively referred to as "Defendants."

10. Attentive Care of Albany, Inc.[2] is a corporation organized on or around April 17, 1980 under the laws of the state of New York that provides home health aides (HHA's) throughout the state of New York.

11. Attentive Care used Defendants to file the collection lawsuit against a third party (Theresa Iacovo) for putative home health aide debt of her mother (Geraldine Iacovo).

## C. STATEMENT OF FACTS

12. On December 18, 2018, Theresa Iacovo executed a Durable Power of Attorney over healthcare decisions regarding her mother Geraldine Iacovo.

13. While Geraldine Iacovo was mentally competent, she was legally blind and needed assistance, both to understand financial and healthcare documents as well as to do tasks like taking a shower and cooking.

14. When Geraldine Iacovo moved to New York, she retained the services of Attentive Care in order to have a HHA with her five days a week while her daughter was working and unable to assist her.

***Theresa Iacovo Did Not Agree to Personal Liability and the Guarantee of Payment Section of the Service Agreement Is Blank***

15. On January 24, 2021, Geraldine Iacovo signed a Service Agreement with Attentive Care.[3]

**Exhibit A** (Service Agreement).

---

[2] The CEO of Attentive Care is Brian Botshon. Mr. Botshon runs a number of companies with variations of the name "Attentive Care," (e.g. Attentive Care of Rochester, Inc. and Attentive Care, Inc.). Attentive Care and Botshon have a troubled legal history. On December 18, 1987, the Appellate Division of the Supreme Court of New York, Fourth Department, upheld a judgment against Botshon pursuant to his guilty plea to violating Penal Law Section 215.40 when Attentive Care altered employment records to intentionally hide "improper racial coding." People v. Botshon, 135 A.D.2d 1107 (N.Y. App. Div. 1987).

[3] Upon information and belief, while this Agreement identifies the provider as "Attentive Care, Inc.," based on the named plaintiff of the Collection Lawsuit being Attentive Care of Albany, Inc., it appears this was Attentive Care of Albany, Inc. doing business as Attentive Care, Inc.

5

16. The Service Agreement began with "Client/Patient Name: Geraldine Iacovo," and contained the following pertinent provisions:

    a. "Payment Terms and Unconditional Guarantee: I hereby assign all medical and/or surgical benefits to include major medical benefits to which I am entitled, including Medicaid, no-fault benefits, private insurance, Health Maintenance Organizations, Long Term Care Insurance benefits and all other health plans to: Attentive Care, Inc. I understand that acceptance of this assignment of benefits by Attentive Care does not guarantee payment. Payment is due upon receipt of invoice as indicated in this Service Agreement." *Id.*, ¶ 8.

    b. "I hereby absolutely and unconditionally guarantee to Attentive Care, Inc. the prompt payment when due of any and all past and future invoices. I understand I am fully financially responsible for any and all charges incurred in the course of treatment services rendered and shall pay weekly invoices upon receipt…In the event of default, if the account is referred to an attorney for collection, I agree to pay an additional charge for all collection costs, including reasonable attorney's fees." *Id.*, ¶ 11.

17. These and the other provisions on the first two pages of the Service Agreement use the first person pronoun "I," clearly referring to promises made by the "Client/Patient" named at the beginning of the agreement.

18. In the field labelled "Client Signature," Geraldine Iacovo signed her name. *Id.*, p. 2.

19. On the next page, in the field labelled "Authorized Personal Representative Signature," Theresa Iacovo signed her name. *Id.*, p. 3.

20. The term "Authorized Personal Representative" is not used in any of the provisions on the first two pages of the Service Agreement.

21. In this context, "Personal Representative" is clearly being used as the term of art in the healthcare industry (which is also the plain meaning of the term) – a person given authority by the client to make decisions on their behalf.

22. The neighboring field "Relation to Client" is filled in with "Daughter POA." *Id.*

23. Beneath the section filled out by Theresa Iacovo is a section titled in bold text "**This is a Guarantee of Payment**." *Id.*

6

24. This section clearly lays out an agreement to guarantee "prompt payment when due of any and all past and future invoices." *Id.*

25. However, this section was left blank.

26. Notably, it bears a different title for the signatory than the section filled out by Theresa Iacovo, labelled "Co-signer/Guarantor" rather than "Authorized Personal Representative."

27. Further, the document notes "A copy of a document authorizing the Co-signer/Guarantor, (Power of Attorney, Court Order Appointing Guardian, etc.) must be attached hereto and made part hereof. No such "document" is attached.

28. It is therefore clear that no third party agreed to be guarantor of payment for "any and all past and future invoices," and the sole party with financial responsibility of such invoices was Geraldine Iacovo.

29. Geraldine Iacovo and Theresa Iacovo signed their respective sections of the Service Agreement with this understanding.

30. While there is no signature from Attentive Care on this copy of the Agreement, their acceptance thereof is demonstrated by their performance of the services enumerated in the Agreement as well as seeking payment for invoices thereof.

31. Accordingly, Attentive Care accepted and agreed to there being no guarantor of payment, and Geraldine Iacovo being the sole financial responsible party.

*The Lawsuit Is Filed Against Theresa Iacovo Despite No Basis for Liability*

32. On June 27, 2023, the Defendants, on behalf of Attentive Care, filed a Summons and Complaint in New York Supreme Court, County of Suffolk to initiate a collection lawsuit against Geraldine Iacovo and Theresa Iacovo, captioned *Attentive Care of Albany, Inc. v. Geraldine Iacovo and Theresa Iacovo*, Index No. 615830/2023 ("the Collection Lawsuit"). **Exhibit B**

7

(Summons and Complaint).

33. The Summons and Complaint were both signed by Defendant Lawrence P. Magguilli. *Id.*

34. Further, it attached as "Exhibit A" the Service Agreement. *Id.,* pp. 13-15.

35. The very Service Agreement Defendants attached to the Verified Complaint demonstrates that the Defendants had no basis to sue Theresa Iacovo for the reasons stated in the prior section of this complaint.

36. In addition when receiving the account from Attentive Care, and prior to filing suit, Defendants received from Attentive Care a "New Claim Placement Form" that provided additional evidence that Theresa Iacovo had no liability. **Exhibit C** (New Claim Placement Form). Under the header "debtor information" the Form named Geraldine Iacovo. However, the name under "co-debtor information" was blank. Under "additional remarks" the Form simply noted, "Daughter is POA from Mother."

37. Defendants represented to the court and to Theresa Iacovo that they had performed a meaningful attorney review prior to filing the Collection Lawsuit, and that review would include the Service Agreement.

38. This representation was either false, or Defendants reviewed the Complaint, saw the "This is a Guarantee of Payment" section was blank, and proceed to file the action although it was clear that there was no claim against Theresa Iacovo, a third party.

39. Further suggesting that Defendants performed no meaningful attorney review of the complaint prior to filing is the inclusion of the following statement which appears to have been inserted in error from an unrelated lawsuit: "Defendants were enriched by the periodontal services rendered by Plaintiff, the reasonable value of which is $10,494.38." *Id.,* ¶ 28.

40. To avoid any ambiguity, this lawsuit solely sought a debt incurred by the provision of

8

home health aide services, *not* "periodontal services."

41. The Collection Lawsuit alleged 5 causes of actions against Theresa Iacovo:

    a. Breach of Contract;

    b. Attorney's Fees;

    c. Account Stated;

    d. Unjust Enrichment; and

    e. Quantum Meruit. *Id.,* pp. 3-5

42. No claim for breach of contract could lie against Theresa Iacovo, as she did not agree to anything by signing the contract other than that she assisted her mother in signing up for the services.

43. Theresa Iacovo did not "absolutely and unconditionally guarantee" payment to Attentive Care because agreement to this promise required signing the section titled "This is a Guarantee of Payment," and that section was not signed by any party.

44. No claim for attorney's fees against Theresa Iacovo could lie because this claim depended on a provision for attorney's fees in the Service Agreement which was only agreed to by Geraldine Iacovo.

45. No claim for account stated could lie against Theresa Iacovo as she clearly and consistently told Attentive Care that she would not and did not agree to be personally liable for the debt, and all invoices provided clearly show the services at issue were being provided to Geraldine Iacovo per the Service Agreement.

46. No claim for unjust enrichment could lie against Theresa Iacovo as all services were provided to Geraldine Iacovo, and thus Theresa Iacovo was not "enriched."

47. No claim for quantum meruit could lie against Theresa Iacovo as no home healthcare

services were provided to her – all services were provided to Geraldine Iacovo.

48. The Collection Lawsuit sought $10,494.38 with interest and costs. *Id.*

49. While Theresa Iacovo would learn about the Collection Lawsuit from her mother, it was never served on her.

***Defendants Aggressively Litigate the Collection Lawsuit Even After Being Put on Notice that Theresa Iacovo Had No Personal Liability***

50. On July 28, 2023, Theresa Iacovo filed an Answer *pro se* on behalf of herself and, as Power of Attorney, on behalf of Geraldine Iacovo. **Exhibit D** (Pro Se Answer).

51. Most notably, the Answer states "Theresa Iacovo should not be a defendant in filing as she only serves as PoA for Geraldine Iacovo who is Blind – Theresa did not receive any services from Attentive Care nor is a guarantor of payment." *Id.,* p. 2.

52. Defendants already knew or should have known this from a basic review of the Service Agreement, where Theresa Iacovo is clearly identified as PoA and clearly did not fill out the section to guarantee payment to Attentive Care, and only Geraldine Iacovo signed to receive services from Attentive Care.

53. However, even if Defendants had failed to perform a basic review before filing the Collection Lawsuit, the Answer provided clear notice that no claim lay against Theresa Iacovo, and accordingly they should have moved to discontinue against her with prejudice.

54. Instead, on September 27, 2023, Defendants filed against Geraldine Iacovo a Motion to Strike the Answer and to enter a default judgment. **Exhibit E** (Motion to Strike).

55. When she learned of the Motion, Theresa Iacovo searched for representation in the Collection Lawsuit and was able to retain the services of Nassau Suffolk Legal Services (NSLS), a nonprofit providing free legal representation to low-income New Yorkers in Long Island.

Last saved: 10/14/2025 1:15 PM

***Defendants Refuse to Discontinue with Prejudice Despite Admitting that Guarantor Section of Service Agreement Was Not Signed***

56. When NSLS appeared in the action, Defendants stipulated to withdraw their Motion to Strike and to allow the Iacovos to file an Amended Answer.

57. On December 20, 2023, Theresa Iacovo filed an Amended Answer. **Exhibit F** (Amended Answer).

58. Among other defenses, the Amended Answer laid out in detail why there was no cause of action against Theresa Iacovo. *Id.,* ¶¶ 29-43, 50-53.

59. Expanding on the prior defense asserted, Theresa Iacovo noted that "Nowhere in the service agreement is there a definition of Authorized Personal Representative" (¶ 31), and as such the court should look to how the term is defined under New York law, which makes it clear that Theresa Iacovo was only representing that she could "act on behalf" of Geraldine Iacovo "in making health care related decisions" (¶¶ 32-34).

60. The Amended Answer concluded that "Defendant Theresa Iacovo never intended to, and never did assume financial responsibility" (¶ 38), that "This Court should dismiss the Complaint" (¶ 43).

61. When Defendants failed to take any actions to discontinue the Collection Lawsuit against Theresa Iacovo, she filed and served a Motion to Dismiss on February 18, 2024. **Exhibit G** (Motion to Dismiss).

62. On April 10, 2024, Theresa Iacovo through her counsel emailed Defendants demanding to discontinue the Collection Lawsuit. **Exhibit H** (Demand to Dismiss Case).

63. In addition to repeating the prior reasons why no action lay against Theresa Iacovo, this Demand also noted that "the contract…refers at all times to Geraldine Iacovo in the first person," listing the following examples:

11

    a. Attentive Care "will strive to provide appropriate home health caregivers who meet my health care needs according to my physician's orders and nursing assessment" (Preamble);

    b. "I hereby voluntarily consent and request the service of Attentive Services (PCA)" (Preamble);

    c. "gi Client Initials" (Preamble);

    d. "I authorize information in my medical record to be released…on my behalf" (¶ 6);

    e. "I hereby assign all medical and/or surgical benefits to include major medical benefits to which I am entitled" (¶ 8); and

    f. "I hereby absolutely and unconditionally guarantee to Attentive Care, Inc. the prompt payment when due of any and all past and future invoices. I understand I am fully financially responsible…I agree to pay an additional charge for all collection costs, including reasonable attorney's fees" (¶ 11).

64. On April 11, 2024, Defendant Lawrence Magguilli responded by email "We did not oppose your motion – is there a reason the court didn't grant it? I believe you were correct in that we never obtained jurisdiction over her." **Exhibit I** (Emails on Discontinuing).

65. Theresa Iacovo responded on April 12, 2024 by counsel, stating that regardless of the issue of service that the contract showed on its face that there was no cause of action against Theresa Iacovo. *Id.*

66. Defendants ignored the email.

67. On May 2, 2024, Theresa Iacovo's counsel sent a short follow up email stating "Sending again for your consent to dismiss."

68. On May 9, 2024, nearly a month after the demand to dismiss on the merits with prejudice as to Theresa Iacovo was first made, Defendants responded stating that they would consent as to dismissal "as to both defendants without prejudice, but they would then want me to re-file and attempt service again."

69. Even worse, Defendants then attempted to collect on the debt (which it was clear Theresa

Iacovo did not owe) by stating "I believe they would be willing to settle the matter if the Iacovos have a settlement offer they could make at this time."

70. On May 13, 2024, Theresa Iacovo through her counsel again demanded immediate dismissal with prejudice. **Exhibit J** (Email Claiming Liability).

71. On May 14, 2024, Defendants admitted that "a separate guarantor signature block […] was not completed in this case," but nevertheless claimed that "as the authorized personal representative, Theresa Iacovo agreed to be personally responsible for the debt in addition to Geraldine." *Id.*

72. To make this argument, Defendants pointed to the word "AND" between the signature blocks of Geraldine Iacovo and Theresa Iacovo, and then bizarrely pointed to a section of the contract which states that "co-signor/guarantor accepts responsibility for prompt payment of the services rendered."

73. Ultimately, the parties agreed to discontinue the case without prejudice.

**Defendants' deceptive lawsuit has placed an additional burden on Theresa Iacovo while she is already strained between working and taking care of her mother.**

74. After Attentive Care stopped providing services to her mother and the lawsuit was filed against her, Theresa Iacovo had to leave her job to handle responding to the lawsuit and taking care of her mother.

75. Frustratingly, the Defendants kept calling Geraldine Iacovo and leaving messages. Because of her disabilities, Geraldine Iacovo cannot answer her phone.

76. After Geraldine Iacovo told Theresa Iacovo that someone had served legal papers on the home health aide (from a new agency), Theresa Iacovo waited and wait to either get personally served or receive something in the mail but nothing happened.

77. When Theresa read the Complaint, she noticed the claim for "periodontal services." It

13

was frustrating that they were putting her through hell when they clearly were not doing their due diligence.

78. She tried to keep calm for her mother's sake, but she was freaking out, wondering what would happen.

79. Theresa Iacovo knows that her mother's Social Security is exempt from being restrained or garnished, so she is worried that they will go after Theresa Iacovo's salary instead.

80. To file the *pro se* Answer, Theresa had to go to a local law library in Central Islip to receive assistance. While she was there, she could not stop crying.

81. As a professional nanny, Theresa worried about getting work, knowing that background checks could show that there was a lawsuit against her.

82. When Theresa got new work, she had to take time off work to handle the Collection Lawsuit. At the time, she made about $33 an hour. She also had to disclose to her boss that the lawsuit was happening in order to get help printing documents that she needed for court.

83. She paid money to send documents to the Defendants by certified mail.

84. In court, she felt humiliated, that her mother's debt and the false statements about her were being exposed to the many strangers also in court.

85. She was worried that people would think she was a deadbeat and not paying her bills.

86. It took her months to find representation in the Collection Lawsuit, speaking with multiple private attorneys, her local Assembly member, her Congressional representative, a deacon from her church, and many others.

87. She felt overwhelmed and like she was a failure.

88. Theresa felt like nobody would help her because she could not afford a lawyer, that she was on an island by herself.

89. She incurred expenses having to go to court.

90. Theresa lost sleep over the Collection Lawsuit, grinding her teeth from the stress so much that she now needs to have dental work done.

91. To be able to sleep, Theresa Iacovo had to practice 10 minute meditations every night after helping her mother go to bed. She would also pray often.

92. Her mother felt guilty, that she was responsible for Theresa Iacovo being sued over her debt, which in turn would distress Theresa, causing both of their lives to spiral.

93. The distress became so severe after the first hearing in the Collection Lawsuit that Geraldine Iacovo had a stroke. Theresa thought during the stroke that her mother had died, and even after her mother was taken to the hospital and regained consciousness, her inability to speak and the bruises covering her arms were horrific to Theresa Iacovo.

94. Theresa had indigestion due to the stress from the Collection Lawsuit. She would eat junk food to have some sense of comfort, causing her weight to fluctuate widely.

95. Theresa is embarrassed by her appearance, feeling like the exhaustion and stress apparent on her face makes her look like she's 82 years old. Her hair is falling out in chunks, and she is upset about how she will look for upcoming social events like a wedding.

### D. COUNT # 1: VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

96. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

97. The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); see also *Hamilton v. United*

15

*Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

98. Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

99. The obligation allege to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative nursing home debt was incurred primarily for family, personal or household purposes.

100. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

101. Defendants are "debt collector[s]" as defined in 15 U.S.C. § 1692a(6) because they regularly attempt to collect debts, directly or indirectly.

102. Defendants collect putative debts by filing hundreds of collection lawsuits seeking to collect putative nursing home debts.

103. On information and belief, Defendant also sends out hundreds of collection letters seeking to collect putative nursing home debts.

16

104. The actions of Defendant enumerated in the above statement of facts constitute an attempt to collect a debt, or were taken in connection with an attempt to collect a debt, within the meaning of the FDCPA.

105. Defendant violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation Defendant materially violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; falsely representing or implying that a consumer committed any crime or other conduct in order to disgrace the consumer; communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

106. The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

107. Theresa Iacovo suffered economic injuries that historically have provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for postage and

17

travel expenses, and lost wages.

108. Theresa Iacovo suffered physical injuries that historically have provided a basis for lawsuits in American courts, including but not limited to the damage to her teeth from grinding them at night due to stress.

109. Theresa Iacovo's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, wrongful litigation, and abuse of process.

110. Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

## SECOND COUNT
### Gross Negligence (as to all Defendants)

111. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

112. Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

113. Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

114. Defendants' actions evince a reckless disregard for the rights of Plaintiff and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

115. Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Plaintiff is entitled to a punitive damage

18

award.

### E. JURY DEMAND.

116.  Plaintiff demands a trial by jury.

### F. PRAYER

117.  WHEREFORE, Plaintiff requests the following relief:

   a.  A declaration Defendant has committed the violations of law alleged in this action;

   b.  Statutory damages under 15 U.S.C. § 1692k;

   c.  An order awarding disbursements, costs, and attorneys' fees;

   d.  A judgment for actual, punitive, statutory, and treble damages;

   e.  Prejudgment and post judgment interest as allowed by law;

   f.  All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

Dated:  Brooklyn, New York
        October 14, 2025

>                               Respectfully submitted,
>                               /s/
>                               Ahmad Keshavarz
>                               The Law Office of Ahmad Keshavarz
>                               16 Court St., Suite 2600
>                               Brooklyn, NY 11241-1026
>                               Phone: (718) 522-7900
>                               Fax:    (877) 496-7809
>                               Email: ahmad@NewYorkConsumerAttorney.com

19